**Mark K. KRIEG, Plaintiff-Appellant,**

v.

**PAUL REVERE LIFE INSURANCE COMPANY, Defendant-Appellee.**

No. 82–5439.

United States Court of Appeals, Eleventh Circuit.

Nov. 3, 1983.

Hagan & Waggoner, Charles Hagan, Jr., Paul H. Waggoner, Bokeelia, Fla., Howard L. Garrett, Tampa, Fla., Alice K. Nelson, Tampa, Fla., for plaintiff-appellant.

Don A. Banta, Chicago, Ill., for defendant-appellee.

Before RONEY and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

The sole issue in this age discrimination case is whether the evidence at trial was sufficient to require reversal of the district court's judgment for defendant notwithstanding a $137,832 jury verdict. Holding the evidence was insufficient to support the jury verdict, we affirm.

We review the trial court's granting of a judgment n.o.v. under the same standard as the district court applies in the first instance.

> [T]he Court should consider all of the evidence ... in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion[ ] is proper.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc).

Plaintiff brought this suit under the Age Discrimination in Employment Act. 29 U.S.C.A. § 621 *et seq.* There is no dispute that he established a prima facie case of age discrimination by proving: (1) his membership in the protected class; (2) his discharge; (3) his qualification for the position; and (4) his replacement by one outside the protected class. *Marshall v. Goodyear Tire & Rubber Co.,* 554 F.2d 730, 735 (5th Cir.1977) (adopting for ADEA suits the criteria established for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). The defendant then introduced evidence articulating reasonable factors other than age for the discharge. *Marshall v. Westinghouse Electric Corp.,* 576 F.2d 588, 590–92 (5th Cir.1978). It was then incumbent on the plaintiff to prove that the employer's proffered reasons for the discharge were but a pretext. *Smith v. Farah Manufacturing Co. Inc.,* 650 F.2d 64, 68 (5th Cir.1981). As the Court observed in *Smith,* when the parties have developed their full proof it is unnecessary to analyze the evidence according to "the ebb and flow of shifting burdens" of proof under *McDonnell Douglas. Id.* at 68. At that point, the trier of fact must determine whether plaintiff has met the ultimate burden of showing the employer intentionally discriminated against him in violation of the ADEA.

Mark Krieg successfully worked for Paul Revere Life Insurance Company for some 26 years. He moved up in the company,

becoming a regional sales vice president in 1969. In November, 1974, Krieg stepped down to assume the position as general manager of the company's agency in Charlotte, North Carolina, in effect appointing himself to that position pursuant to his authority as vice president. Two years after he became general manager, the company terminated Krieg and replaced him with a 27-year-old man. Because he was qualified for the job and was within the protected age group, being 58 years old, those facts proved a prima facie case. A brief review of the events leading to Krieg's termination demonstrates why defendant was entitled to judgment.

During the course of Krieg's career, the company recognized his success both as a sales person and as a manager. He introduced several letters from his superiors, two of which he received shortly before his termination, lauding his accomplishments in a variety of areas.

On August 27, 1976, however, Robert Bates, the person who replaced Krieg as sales vice president, met with Krieg and voiced several concerns about Krieg's performance as general manager: the first was a decline in the agency's business, the second dealt with problems relating to the development of management trainees, and the third was knowledge and the apparent jealousy of other managers about the amount of Krieg's guaranteed salary. Krieg indicated he could "no longer do this job" because of the stress involved and that he would be willing to retire from the general manager's position if he could continue with the company as an agent writing personal business. He requested that the company guarantee a salary of $25,000 a year for four years, at which time he would be 62 years old and eligible for social security benefits. Bates told Krieg "that it certainly was not healthy to have a man in the job who did not have his heart in it. . . ." In a letter to Bates dated August 31, Krieg proposed the terms of an agreement that would allow him to leave the general manager's position. The letter stated Krieg's desire to reach an agreement without delay because "once a decision is made to leave, the quicker the better."

Bates forwarded copies of his memorandum concerning the August 27 meeting and Krieg's letter to Ralph Stoughton, the company's vice president for sales. In a cover letter, Bates stated his desire "to get Krieg out of the region as soon as possible." He focused his wishes on Krieg's failure to develop two management trainees, stating that Krieg was "doing very little . . . and [would] continue to do little." Bates observed that paying Krieg $25,000 a year for four years "doesn't sound all that bad to me to get him out of the way," since the company would have to pay Krieg $100,000, based on his $50,000 a year guarantee as general manager, if he worked to age 60 as he originally had planned. The cover letter stated that while Krieg could have been a "very positive influence" on both the region and the company as general manager, he had instead been a "negative influence and a thorn in the side. On that basis, I certainly do not want to pass up this opportunity to get him out as soon as possible."

At Stoughton's direction, the company's secretary prepared a written offer for presentation by Bates and Stoughton to Krieg at a meeting on September 23, 1976. Stoughton opened the meeting by asking Krieg why he wanted to step down as general manager. Krieg outlined in great detail his inability to continue working the long hours required by the general manager's position and criticized the company, its product, and methods of operation. Krieg stated he had offers from other companies, that he "knew his way around the Southern Region and would make it difficult" for the company, and finally that, while he did not want to, he would compete against the company. Stoughton and Bates interpreted these remarks as a direct threat.

Despite Krieg's criticisms, Stoughton proceeded to describe the terms under which Krieg could remain with the company while writing personal business. The offer included a personal production quota of $400 a month. There was evidence that it would take four or five sales a month to meet this

requirement. Krieg told Stoughton the $400 monthly production requirement was unacceptable and that he would prefer to stay on as general manager. Stoughton then said that option was no longer available. By the end of the meeting, it became clear Krieg had the option of either resigning or being terminated. Krieg later contacted Bates indicating that he would like to see the written offer to determine whether it might be acceptable after all. Bates replied that Stoughton had taken the letter. Stoughton then wrote Krieg a letter dated October 1, 1976, which stated:

At your request, we held a meeting in Charlotte on September 23, 1976. At this meeting, you informed Bob Bates and myself that you no longer wish to function as a General Manager. You also were very specific in that no production requirements would be acceptable to you under any plan we might wish to propose. At the conclusion of our meeting, you stated that you wanted to decide whether it would be best to resign or simply have Paul Revere terminate your contracts. You also agreed that you would reach your decision by October 1, 1976.

Enclosed you will find your formal termination notice. In lieu of this termination letter, the Company will accept your resignation dated October 1, 1976, if this is your preference.

Krieg never responded, and the company filled his position with a 27-year-old man.

There was no substantial dispute about these facts. After the jury returned a verdict for Krieg, Paul Revere argued there was no evidence to support a finding that it discharged Krieg because of his age. It contended that it was only after Krieg had stated his unwillingness to continue performing his duties as general manager, expressed his low regard for the company, and refused to accept the production requirement that the company legitimately responded by saying "resign or be fired." The district court agreed and entered a judgment n.o.v.

■ Because the defendant offered evidence of its legitimate reasons for firing

Krieg, any presumption of discrimination arising out of the prima facie case "drops from the case." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254–55 & n. 10, 101 S.Ct. 1089, 1094–95 & n. 10, 67 L.Ed.2d 207 (1981). Without a presumption, the question becomes whether the plaintiff's proof constituted evidence substantial enough to raise an inference of discrimination. In this case, the issue is whether there is sufficient evidence to support the jury's verdict that plaintiff carried the burden of showing that the company's proffered reasons for the discharge were merely a pretext for firing Krieg because of his age.

■ Krieg raises three points in arguing the company's proffered reasons were a pretext. First, he asserts the company treated him differently from younger general managers who voiced complaints about the company. He relies on an incident involving Bates, who at one point served as general manager of the Roanoke, Virginia office and reported to Krieg as regional sales vice president. As general manager, Bates wrote several letters to Krieg complaining about the quality and timeliness of the company's accounting procedures. Bates resigned in 1974, just before Krieg relinquished the sales vice presidency to become the general manager in Charlotte. Stoughton subsequently appointed Bates to succeed Krieg as regional vice president. Krieg maintains these events support an inference that young general managers who complained got promoted, but old general managers who did so got fired.

This single incident differed too much to permit such an inference. There is no evidence whatever that Bates resigned because he was disgruntled or disillusioned with the company, as Krieg contends. Nor is there any evidence that Bates had threatened to leave and use his knowledge of the region to benefit a competitor. There is a qualitative difference between Bates's acts of writing letters to his superior to complain about internal accounting procedures and Krieg's statements that the company was

"backwards," "cheap," and had an "inferior product."

Plaintiff's second argument is that the statistical evidence supports an inference that the company had a *policy* of terminating older employees. The ADEA applies to people 40 years of age and over. 29 U.S.C.A. § 631. The percentages of all general managers terminated who were over the age of 40 compared to the percentages of those terminated who were under 40 were as follows:

| Year | % of General Managers 40 & over | % of all General Managers Terminated who were 40 & over | % of General Managers under 40 | % of all General Managers Terminated who were under 40 |
|------|------|------|------|------|
| 1975 | 70.2% | 53.8% | 29.8% | 46.2% |
| 1976 | 68.7% | 60% | 31.3% | 40% |
| 1977 | 67.6% | 55.5% | 32.4% | 44.5% |
| 1978 | 70.1% | 66.6% | 29.9% | 33.4% |

Plaintiff's argument based on these statistics fails for two reasons. First, the statistics themselves are insufficient to support the argument. It is not significant that a majority of the general managers terminated were in the protected age group, because that group comprised the majority of all general managers employed by the company. Rather, the significant fact is that the percentage of terminated general managers who were over 40 was less than the percentage of general managers in that age group employed by the company. *See Pace v. Southern Railway System,* 701 F.2d 1383, 1388–89 (11th Cir. 1983). Furthermore, there is nothing in the record to indicate whether the company replaced those over 40 with managers outside of the protected age range. The fact that in 13 years only five general managers reached the normal retirement age of 65 has no evidentiary value. The plaintiff conceded that turnover among general managers was high. There is no evidence as to how many general managers voluntarily resigned, took early retirement, stayed with the company but were promoted or returned to straight sales, or died prior to reaching the normal retirement age.

The second reason the statistics cannot carry plaintiff's burden is that they do not negate the reasons given by the company for Krieg's discharge. Even if the statistics did show that the company sometimes discriminates because of age, which is the best they could show because some general managers in the protected age group were not discharged, they do not show that the company did so in this instance.

Finally, plaintiff argues that the company treated him differently than other general managers who resigned to return to straight sales work because it sought to impose on him a monthly production requirement of $400 while the monthly requirement for others ranged from none to $150. Without going into unnecessary detail about each general manager mentioned, the evidence established that the differences in the amount of required production varied from person to person based on several factors. These included the value of their general manager's contract based on "commission overrides," and whether the person was disabled, held an "old" or "new" manager's contract, or returned to straight sales or had other supervisory duties. One resigning general manager who was over 40 had a monthly production requirement of $750, almost twice that proposed to plaintiff. While the differences in production requirements may be attributable to various factors, they do not support an inference they are attributable to age.

In this case, the district court properly determined that the evidence was insufficient to support an inference of discrimination. The jury's verdict was properly set aside.

AFFIRMED.

KRAVITCH, Circuit Judge, dissenting.

I respectfully dissent. The majority states: "In this case, the issue is whether there is sufficient evidence to support the jury's verdict that plaintiff carried the burden of showing that the company's proffered reasons for the discharge were merely a pretext for firing Krieg because of his age." Maj. Op. at 1001.

Proof of mere pretext, however, is not the only way in which plaintiff can carry "the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. This indirect route may be taken, but plaintiff may also proceed "directly by persuading the court that a discriminatory reason more likely motivated the employer . . . ." *Id.* Once this is recognized, one half of the majority's analysis unravels. The majority explains why the evidence proffered by Krieg does not "negate" defendant's proffered reasons but fails to address why "reasonable" persons could not conclude that discrimination was the more likely motive.

The other half of the analysis collapses because, while quoting *Boeing v. Shipman Co.,* 411 F.2d 365, 374 (5th Cir.1969) (en banc), and giving reasons why the evidence proffered by Krieg would not have warranted a directed verdict in his favor, the majority fails to show why the evidence was inadequate to *permit* the jury to infer discrimination. *See id.*

First, that the form of Bates' complaints were qualitatively different from Krieg's complaints does not preclude "reasonable men," *Boeing v. Shipman Co.,* 411 F.2d at 374, from concluding that discrimination rather than that qualitative difference was the basis for the disparate treatment. Given the defendant's evident eagerness to seize the opportunity to terminate Krieg, the jury reasonably could have concluded that "a discriminatory reason more likely motivated the employer . . . ." *Texas Department of Community Affairs v. Burdine, supra.*

Second, in my view it cannot be said that the fact that in 13 years only five general managers reached the normal retirement age has *no* evidentiary value. Maj. Op. at 1002. I would agree that such general evidence would not have justified a directed verdict for Krieg and by itself may not have been sufficient to preclude a directed verdict in the defendant's favor, but such an unrebutted, unexplained fact, in conjunction with the other evidence presented, has some probative value. Further, while I agree that here the statistics proffered by plaintiff do not support an inference of discrimination, I would analyze the statistics differently. In *Pace v. Southern Railway System,* 701 F.2d 1383 (11th Cir.1983), which the majority cites to support its analysis, we held that an inference of discrimination necessary to create a prima facie case based on statistical evidence was not established. In so doing we noted that the relevant statistical comparison for these purposes was of the percentage of workers in the protected category who were promoted (here terminated) in the relevant time period to the percentage of workers in the nonprotected category who were promoted (terminated) in the same period. *Id.* at 1388–89. Extrapolating from the statistics plaintiff has provided here and which are cited in part in the majority opinion, in 1978 approximately 30.43% of general managers under age 40 were terminated while only approximately 25.92% of the general managers in the protected category were terminated. In 1977, 52.17% of general managers under 40 were terminated while only 31.25% of those in the protected group were terminated. In 1976, approximately 30.76% of general managers outside the protected group were terminated while approximately only 21.05% of those 40 and over were released. In 1975, 24% of those under 40 and only 11.86% of those in the protected group were terminated. Based upon that four-year period, an average of 34.34% of the managers under age 40 were terminated annually while an average of only 22.47% of the managers in the protected group were terminated annually. Where a consistently smaller percentage of the protected group

was terminated than of the non-protected group, no possible inference of age-based discrimination can be drawn from the statistics. Thus, while disagreeing with the majority's analysis, I agree with the conclusion that the statistics do not support an inference of discrimination.

Third, however, I am at a loss as to why the evidence concerning the high production requirement does not allow an inference of discrimination. The majority concludes that the differences are attributable to "various factors" but rejects the possibility that one of those factors may have been intentional discrimination. While the majority and the district court may not have inferred discrimination from this evidence if they were on the jury, I disagree that such an inference was beyond the realm of the reasonable. Indeed the example cited by the majority of one resigning general manager *also over age 40* who was given an even higher production requirement than Krieg supports an inference that Krieg and others in the protected group were being pushed out by the company.

Finally, it may be that had I been a juror in this case I would have concluded that Krieg was terminated because he was causing trouble and was unable to produce adequately. There is substantial evidence, however, that the company used Krieg's criticisms and anger as a way to push him, an employee in the protected age category making a relatively large salary, out of the way for younger, less expensive employees. I cannot join the majority's determination that this was not a reasonable conclusion. Our role is not to second-guess the jury's evaluation as long as "reasonable" persons could differ. This is admittedly a close case, which is precisely the reason the jury's verdict must be respected if the evidence permits an inference of discrimination. *Boeing v. Shipman Co.,* 411 F.2d at 374. I would reverse the grant of judgment notwithstanding the verdict and order the jury verdict for the plaintiff reinstated.