**James W. DODD, Plaintiff,**

v.

**The SINGER COMPANY, Defendant.**

**Civ. A. No. C85–4305A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

July 20, 1987.

William G. Gainer, Nation & Associate, Conyers, Ga., for plaintiff.

Michael C. Murphy, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., Peggy L. Braden, The Singer Co., Stamford, Conn., for defendant.

## ORDER

SHOOB, District Judge.

Plaintiff James W. Dodd ("Dodd") filed this action under the Age Discrimination of Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* On December 17 and 18, 1986, the claim was tried before this Court and a jury. At the close of plaintiff's case-in-chief, defendant The Singer Company ("Singer") moved for a directed verdict and the Court proceeded to hear arguments from both parties on the motion.[1] Following the argument, the Court ruled from the bench, granting defendant's motion for a directed verdict. The follow-

---

1. During the argument, the Court referred to the testimony of Mr. Alan Levenson, who had been called as a witness out of turn by defendant before plaintiff rested his case. At that time defendant, to clarify the record, rested its case.

ing are the Court's summary of the facts presented and conclusions of law.

## I. *Facts Presented at Trial*

In November, 1984, Singer terminated Dodd's employment as a District Sales Manager ("DSM"). As of July, 1984, Singer had twenty-four DSMs throughout the United States who were supervised and directed by three Regional Managers ("RM"). Each RM supervised approximately eight DSMs. The DSMs sold sewing machines and related products directly to Singer dealers and, despite their title, did not supervise anyone. (Trial Transcript, "T.T." at 12, 86.)

Dodd was terminated in November, 1984 when Singer conducted a reduction in force ("RIF"). The RIF involved the consolidation of several sales territories and the elimination of sales positions. It resulted in the discharge or early retirement of seven DSMs and the elimination of the three RM positions. Each of the RMs was permitted to "bump down" into the remaining DSM position so that after the RIF there were twenty DSMs and no RMs. The title of District Sales Manager was subsequently changed to Regional Sales Manager ("RSM") to reflect the expanded sales territories for which the remaining 20 RSMs were responsible. (T.T. at 65–67, 81, 96.) In conjunction with the RIF, Singer changed its method of paying its sales managers from salary to straight commission. (T.T. at 113.)

Dodd was 59 years old at the time of his discharge and had been a Singer employee for over 33 years. Dodd, an Atlanta resident, was the DSM in the Atlanta territory of Singer's Eastern Sales Region, and was responsible for developing, maintaining, and increasing sales to dealers of Singer products in Georgia and portions of South Carolina, North Carolina, and Florida. (T.T. at 96, 137, 138.) Dodd's supervisor and regional manager, Mr. Pettijohn, also lived in Atlanta and was familiar with the territory. (T.T. at 122–23.)

According to the undisputed testimony of Mr. Alan Levenson, formerly a Senior Vice President of Singer's North American Sew-

ing Products Division ("Division"), during the 1970's and early 1980's Singer's share of the United States sewing machine market dropped from approximately 43 percent to 23 percent. The total annual sales of sewing machines in the United States decreased from around three million units to one and one-half million units. As a result of the declining market Singer experienced a one hundred million dollar loss between 1980 and 1983. (T.T. at 120–21.) Even as compared to the previous years, however, the first five months of 1984 were characterized as a sales "disaster." Dealer business dropped another fifteen percent. The dramatic drop in sales was attributable in large part to the news released to key dealers in the Spring of 1983 concerning a new line of Singer machines to be introduced in January, 1984. However, production and release was delayed, and the product did not become available to dealers until late 1984 and 1985. In 1985, sales increased by thirty-five percent. (T.T. at 51, 91–92, 97, 115, 178–81.)

Due to its financial difficulties, Singer had made several reductions in force in the early 1980's among both its field sales representatives and its staff support personnel. Following the dramatic loss in the first months of 1984 from the sales of the 24 DSMs, senior management Division officials responsible for sewing machine sales to dealers of Singer products decided that seven DSM positions and three RM positions would be eliminated. Moreover, it was determined that the sales territories would be consolidated along geographical lines in order to maximize sales and minimize relocation and travel costs. (T.T. at 60–61, 40; Plaintiff's Exhibit, "Plf. Ex.," 18.)

Mr. Jack McCrae, Vice President of Sales for Consumer Products in the Division, and Mr. Alan Levenson conducted the RIF. During August and early September, 1984 McCrae and Levenson met with other Division management officials on numerous occasions to draw new territorial boundary lines and determine which of the existing twenty-four DSMs would be retained after the consolidation. (T.T. at 25, 125, 138;

Defendant's Exhibit, "Def. Ex.," 29, 30.) Mr. Levenson testified that Atlanta was the only city where Singer had two sales representatives. He further testified that the ages of the DSMs were never discussed at these meetings and that he had no idea of any of the individual salesmen's ages. (T.T. at 122–123.)

In determining which DSMs would be terminated within each region, McCrae and Levenson relied primarily on current comparative performance data. Specifically, they looked to the DSM's composite scores as of July, 1984. The scores were based on each DSM's performance in the sales of sewing machines and sewing related products to dealers. The scores measured all of the company's performance criteria and objectives. A ranking of the DSM's composite scores was published monthly as an on-going performance monitoring and assessment process. The monthly composite score ranked all 24 DSMs. A low score was desirable. Therefore, the DSM with the lowest score was top-ranked, and the DSM with the highest score ranked at the bottom of the chart. The ranking was done nationally, but each DSM's particular region was designated. There were three sales regions as of July, 1984, the Eastern (Region 22), Western (Region 23), and Central (Region 24). In the Eastern region, the scores in ascending order from the bottom of the ranking chart were Mr. Russell Scohy and Mr. Dominic Russo, both in their late 50's or early 60's, and then Dodd, age 59. Of the five DSMs in the Eastern region who were retained, two were in their mid–50's and all of them had composite scores superior to the three DSMs that were terminated. (T.T. at 54, 59–60, 96, 123–26; Def.Ex. 13.)

During Mr. Dodd's 33 years of service with Singer, the company had used national composite ranking to measure the job performance of each DSM's overall value to the company. Dodd testified that the year-end national composite rankings had always been stressed as a key report. The national composite score as of July, 1984 revealed that Mr. Dodd was ranked thirteenth out of Singer's twenty-four DSMs, and sixth out of eight in his region.

Dodd's national ranking placed him above five other individuals who were retained by Singer after the RIF. These five individuals, none of whom were located in the Eastern Region, were all younger than Dodd. In the Eastern region the three lowest ranking DSMs who were discharged were also the three oldest DSMs in the nation. (T.T. at 90, 170–72, 182.)

In accordance with Singer's policy and practice in prior RIF's, McCrae and Levenson decided that the three RMs whose positions were eliminated would be permitted to "bump down" into the most appropriate DSM position. It was decided that Pettijohn would take over the realigned Atlanta territory since Pettijohn lived in Atlanta and had longtime sales management experience in that region. McCrae and Levenson determined that Pettijohn's appointment, as opposed to Dodd's, was in keeping with Singer's policy of "bumping down" supervisors whose positions were eliminated. (T.T. at 66–67; Def.Ex. 14.)

While McCrae established that the July, 1984 Regional Composite Score ranking was the primary performance criterion used in determining who was retained in the RIF, other performance evaluation evidence was also presented at trial. Dodd introduced his written annual performance appraisals for the years ending in 1981, 1982, and 1983. On an evaluation scale ranging from "outstanding" to "unsatisfactory", Dodd received an "excellent" in 1981, a "good-plus" in 1982, and an "excellent-minus" in 1983. The appraiser, Pettijohn, testified that these appraisal ratings were either average or below average in comparison to the other DSMs in Pettijohn's Eastern region. (T.T. at 9–11; Plf.Ex. 3, 4, 5; Def.Ex. 10.)

In Dodd's 1981 appraisal form, Pettijohn criticized Dodd's attitude toward participation in Singer's "Operation Penetration" which was an on-going market share development program. Moreover, Pettijohn had noted in the 1982 appraisal that Dodd tended to set only routine, as opposed to ambitious, objectives. In support of this criticism, Pettijohn, as a witness, testified to two specific failures or refusals by Dodd to

develop new dealers in Savannah, Georgia and Columbia, South Carolina. Pettijohn testified that he had to undertake the development of the new dealer in Savannah, who subsequently became the most successful dealer in the Atlanta territory. Secondly, a successful dealer in Columbia was later developed by Mr. Al Kearns, the DSM in the Eastern Region's Charlotte, North Carolina territory before and after the RIF. At the time of the RIF, Kearns was in his mid-40's and ranked above Dodd in the July, 1984 composite scores. Due to the territorial realignment, Kearns received a portion of the dealers which were formerly in Dodd's territory. Clifford Wilson, who was based in Memphis and was not considered in the Eastern regional rankings, also received a number of Dodd's accounts. Wilson was twenty-two years younger than Mr. Dodd and ranked twenty-second in the national composite rankings for the end of July, 1984 (ten positions lower than Mr. Dodd). (T.T. at 67–68, 70, 103, 182; Plf. Ex. 3; Def.Ex. 10, 13, 36.)

Dodd introduced evidence showing that he had received numerous award plaques, certificates, and several trips from Singer commending him for his sales performance. Dodd admitted, however, that it was not unusual to win such plaques and trips because almost all of the DSMs in the country received them. Dodd also introduced evidence that he ranked above Kearns in 1983, but Kearns ranked above Dodd in the December, 1981 and December, 1982 rankings. Similarly, Kearns was rated above Dodd in terms of percentage of sales to sales quota and total sales. (T.T. at 97–103, 127–128; Def.Ex. 45, 13.)

On approximately August 16, 1984, Pettijohn informed Dodd that Dodd was likely to be discharged. Subsequently, Pettijohn inquired if Dodd was interested in taking early retirement, for which he was eligible. As a result of that conversation, Dodd informed Stephen Kind, President of Singer, in a letter dated August 16, 1984 that he did not want to take early retirement and wanted to keep his job. (T.T. at 63–64, 81; Plf.Ex. 23.)

On September 18, 1984 McCrae informed Dodd that his employment would be terminated on November 2, 1984. According to both McCrae and Dodd a heated conversation ensued. McCrae testified that Dodd argued in the conversation that he should be retained and Pettijohn should be terminated. McCrae became angry at the suggestion because Pettijohn had always supported Dodd. At trial Dodd admitted that he lobbied for Pettijohn's termination in lieu of his own. (T.T. at 65–67, 85–87, 141–142.)

Although Singer was concerned about incurring relocation expenses during a time of economic crisis, on September 19, 1984, Mr. Wemett a Division management official, offered Dodd the opportunity to transfer to either San Francisco or Seattle sales territories where openings had temporarily arisen. Dodd testified that Wemett gave him until September 21, 1984 to accept the offer and provided no other details on the job except that moving expenses would be paid by Singer. Dodd testified that Wemett provided no further details on the transfer offer, such as compensation or sales volume, and that Wemett would not be available on September 20, 1984 to discuss the transfer offer further. Dodd failed to contact Wemett or McCrae by September 21, 1984 and as a result, did not receive a transfer to another position. Dodd testified that he did not follow up on the offer because he believed that it was not a bona fide job offer. (T.T. at 166–167; Def.Ex. 14.)

This Court can only rely on Dodd's version of the September 19 telephone conversation since Mr. Wemett died before this litigation was initiated. However, the following circumstances surrounding the offer are undisputed. First, Dodd admitted that Wemett had the authority to make the offer and that Singer was in the process of changing its compensation system for DSMs. Secondly, at the time of the transfer offer, no other DSM had been informed of what the new compensation method in San Francisco, Seattle, Atlanta or any other territory would be in the future. Third, Dodd admitted that facts such as the sales volume in those territories as then aligned

were available to him through monthly reports published by Singer. Dodd admitted that on one previous occasion Singer had ordered his transfer without notice or details. Similarly, Dodd admitted that he had nothing to lose by calling Wemett or McCrae on September 21, 1984 in order to confirm the job offer or at least to seek more details if they were available. Instead, in a letter dated September 21, 1984, Dodd opted to have his attorney contact McCrae and threaten an age discrimination lawsuit if Dodd was discharged. (T.T. at 167, 188, 53, 147, 145, 143, 134, 116–17; Def.Ex. 22.)

Dodd was discharged from Singer on November 2, 1984. He received 26 weeks of severance pay and one week of vacation pay. On June 1, 1985 Dodd began receiving monthly benefits under Singer's early retirement plan. Dodd was informed of the terms and reasons for his termination in a letter from McCrae dated October 4, 1984. (T.T. at 148–49; D.E. 14.)

## II. *Conclusions of Law*

The standard to be followed by a trial judge in determining whether to grant a motion for a directed verdict was set forth in *Boeing v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc), and adopted within the age discrimination context in *Buckley v. Hospital Corp. of America,* 758 F.2d 1525, 1527 (11th Cir.1985). Generally, the Court must view the evidence in the light most favorable to the non-moving party. *Id.* at 1527. The Court is required, however, to consider all of the evidence—not just the evidence that supports the non-mover's case. *Boeing v. Shipman,* 411 F.2d at 374–75. Where "the facts and inferences point so strongly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict," granting a motion for a directed verdict is proper. *Id.* at 374–75. Moreover, a motion for a directed verdict cannot be defeated by a mere scintilla of evidence; a conflict in substantial evidence is required to create a jury question. *Id.* at 375.

In an age discrimination case, the ultimate issue is whether the employer intentionally discriminated against the employee on the basis of age. *Pace v. Southern Ry. System,* 701 F.2d 1383, 1387 (11th Cir.), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983). In order to establish a prima facie case, plaintiff must produce "evidence circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate." *Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

It should first be noted that plaintiff in this action did not offer or allege the existence of any direct evidence of age discrimination by Singer. Neither did he produce any statistical evidence indicating a pattern of terminating older workers.

In the present case, Dodd made out a prima facie case of age discrimination by producing evidence as to each prong of the three part test set forth in *Williams v. General Motors,* and *Barnes v. Southwest Forrest Industries, Inc.,* 814 F.2d 607 (11th Cir.1987). Specifically, Dodd demonstrated that he is a member of the protected age group, that he suffered adverse employment action, and that he was at least minimally qualified to continue as a DSM. In addition, Dodd established that after his discharge most of his sales territory was divided between Pettijohn and Kearns, who are younger than Dodd.

Following the production of a prima facie case by Dodd, the burden shifted to Singer to articulate a legitimate, nondiscriminatory motive for Dodd's discharge. *Krieg v. Paul Revere Life Insurance Co.,* 718 F.2d 998 at 999 (11th Cir.1983), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984). In the present case, Singer articulated several legitimate, nondiscriminatory reasons for terminating Dodd's employment.

■ First, Singer was losing money in its sewing machine sales division. The evidence was undisputed that Singer had lost one hundred million dollars in the early 1980's and was continuing to lose money in

1984. As Mr. Levenson testified, "It was obvious that something had to be done." (T.T. at 120.)

Next, as of July, 1984, Dodd was the third worst performer in the Eastern Region. Singer's decision to terminate the three lowest performers in the Eastern Region was supported by its concern for creating new territories of reasonable size and its desire to avoid relocation expenses. Singer's decision to discharge Dodd specifically was supported not only by his low ranking, but also by the fact that he was one of two Singer employees in the Atlanta area. The other Atlanta employee, Pettijohn, had been Dodd's supervisor for eight years.

Third, under the new compensation and commission structure following the reorganization, and in an increasingly more competitive market, Singer believed that Dodd, who had previously been criticized for failing to actively support Singer's market penetration program, Operation Penetration, would not be as effective as Pettijohn. Through the introduction of Dodd's own testimony and exhibits, specific, direct evidence of plaintiff's reluctance to develop new dealers has been established. In fact, Dodd acknowledged this on his performance appraisal forms. Pettijohn testified to two specific instances of Dodd's failing to develop dealers. Under the servicing of Pettijohn and that of another DSM, these dealers subsequently became very successful. Such evidence of an inability to perform well in the future provides legitimate, permissible reasons for discharge under the ADEA. *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1425 (7th Cir.1986) (salesman found "not aggressive," and did not seek business and protected old customers).

Whether Dodd disagrees with this assessment is irrelevant, since it is only Singer's perception of Dodd's performance or abilities that are relevant to a determination of discriminatory intent. *Smith v. Flax*, 618 F.2d 1062, 1066–67 (4th Cir.1980). The fact that Singer's belief that Dodd was not as qualified as Pettijohn to perform in the Atlanta territory could be viewed as subjective is immaterial, since a subjective qualification assessment does not convert an otherwise legitimate reason into an illegitimate one. *EEOC v. Western Electric Co.*, 713 F.2d 1011, 1016 (4th Cir.1983).

Fourth, it had been Singer's policy in the past to "bump" employees with their supervisors when positions were to be eliminated, and examples of this bumping procedure were presented. In the 1984 RIF, all of the Regional Manager positions were eliminated. Pettijohn and the other Regional Managers were offered the opportunity to bump down into the most appropriate remaining position. It made logical sense to allow Pettijohn to bump down into Dodd's sales position because it covered the territory where Pettijohn was already located.

Once Singer proffered these legitimate reasons for Dodd's discharge, it was incumbent on Dodd to prove them to be pretextual. *Krieg v. Paul Revere*, 718 F.2d at 999; *Smith v. Farah Manufacturing Co.*, 650 F.2d 64, 68 (5th Cir.1981). At this point, any presumption of discrimination raised by the prima facie case is no longer relevant, and the trier of fact must then decide the ultimate factual issue of whether Singer intentionally discriminated against Dodd in violation of the ADEA. *Krieg v. Paul Revere*, 718 F.2d at 999; *Smith v. Farah Manufacturing Co.*, 650 F.2d at 68. In the present case, all of Dodd's efforts at showing pretext have proven to be without merit.

First, Dodd has failed to produce any direct or statistical evidence which would tend to show the proffered reasons to be pretextual. Second, Dodd cannot rely on the fact that the three oldest DSM in the Eastern Region were terminated. These three, including Dodd, were indisputably the lowest performers in the region as of July 1984, on the basis of the Composite Score rankings. Third, Dodd cannot claim Singer was not entitled to rely on the July 1984 Composite Score rankings in making the decision to terminate. The use of such sales performance was entirely a legitimate and business-related reason for Dodd's discharge. *Cf. Huhn v. Koehring Co.*, 718 F.2d 239, 240–41, 245 (7th Cir.1983).

Fourth, Dodd cannot point to the offer of transfer and claim that it was not bona fide, where Dodd admits (1) Wemett had the authority to make such an offer, (2) he did not believe the offer was a mistake, (3) it was made clear to Dodd that it was his responsibility to follow up on the offer, and (4) his past experiences with transfer within Singer and his past treatment by Singer gave him no reason to believe this offer was not valid. At the same time, the testimony of Dodd and McCrae, who was called as a witness by plaintiff, establishes that there was every reason to believe that if Dodd had followed up on Wemett's call of September 19, Dodd could have elected to transfer to another territory. Where Dodd made no effort whatsoever to investigate the transfer option, and instead chose immediately to threaten a lawsuit, he cannot now argue pretext. On the contrary, the offer to transfer Dodd—made at a time when Singer was not considering transfer because of expense—is strong evidence of the absence of any discriminatory motive. *See Walter v. KFGO Radio*, 518 F.Supp. 1309, 1313 (D.N.D.1981).

Finally, Dodd cannot rely on evidence that he suffered damage as a result of his discharge. Although there was testimony that he receives approximately $432.00 per month less in retirement benefits than he would have had he worked until age 65, there was no evidence that Singer experienced any net financial gain due to the decreased amount of retirement benefits paid to Dodd. (T.T. at 233–36, 29–31.)

In earlier denying defendant's motion for summary judgment, this Court stated:

Plaintiff meets this rebuttal evidence [of legitimate reasons for Dodd's discharge] by citing Singer's thirty year practice of ranking sales people nationally rather than regionally. Plaintiff also points to apparent inconsistency in the boundaries of the regions allegedly used by Singer and contends that the use of such boundaries was a mere pretext. Although plaintiff's evidence on these points is weak, it presents sufficient evidence [of pretext] to create a genuine issue for the trier of fact.

*Dodd v. The Singer Company*, No. 85–4305A (N.D.Ga. filed October 2, 1986). The evidence presented at trial simply did not bear out plaintiff's contentions on these points. For example, Singer agreed that it traditionally published national rankings of its sales people; but it was established that each sales person's region was noted on the national ranking chart. The evidence presented showed that the sales regions were not created for the purpose of the 1984 RIF, but had long been a part of the Singer sales system. Plaintiff's second contention—that the re-drawn regional boundaries were suspect—was also not borne out at trial. The only evidence relating to redrawing of regional or territorial boundaries demonstrated that Singer re-drew its territories to accommodate the smaller sales force that would exist *after* the RIF. There was no evidence that Singer changed the regional or territorial boundaries before the RIF that might suggest that Singer had manipulated the regional rankings in order to get rid of its oldest employees. Therefore, while the plaintiff's evidence of pretext was "weak" at the summary judgment stage, it was virtually non-existent after trial.

■ The evidence presented at trial overwhelmingly demonstrated that Singer made its reductions in force in accordance with sensible and legitimate business purposes. Where this is the only logical conclusion, an argument of pretext must fail. *Clark v. Huntsville City Board of Education*, 717 F.2d 525, 527 (11th Cir.1983); *see, Olafson v. Dade County School Board*, 651 F.2d 393, 395–96 (5th Cir.1981). Absent reliance on unlawful criteria, the discretion to choose among candidates rests with the employer. *Lieberman v. Gant*, 630 F.2d 60, 67 (2nd Cir.1980). Indeed, it is well settled that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). As stated in *Loeb v. Textron*, 600 F.2d 1003, at 1012 n. 6 (1st Cir.1979),

While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason [for the discharge] was a pretext for illegal discrimination. The employer's stated legitimate reason ... does not have to be a reason that the judge or juror, would act on or approve.

*Accord, Rouseau v. Teledyne Movible Offshore, Inc.*, 619 F.Supp. 1513, 1524 (W.D. La.1985); *Williamson v. Owens-Illinois, Inc.*, 589 F.Supp. 1051, 1057 (N.D.Ohio 1984); *Stacey v. Allied Stores Corp.*, 581 F.Supp. 1103, 1108 (D.D.C.1984). Here, Singer utilized objective, quantifiable factors in determining Dodd was the lesser qualified candidate for the Atlanta territory after the RIF.

In rebuttal, Dodd has advanced no more than his personal belief that age caused his termination, rather than the reasons of economic necessity, poorer relative performance and Dodd's own decision to decline a transfer opportunity. Such a "subjective belief, however genuine [cannot] be the basis for judicial relief [in ADEA cases]." *Elliott v. Group Medical & Surgical Service*, 714 F.2d 556, 567 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984); *see Houser v. Sears, Roebuck & Co.*, 627 F.2d 756, 754 (5th Cir.1980). Moreover, it is not the rule under the ADEA "that because an employee is performing his job adequately, an employer is prohibited from replacing him with one whom [the employer] subjectively believes will do a better job." *Id.* at 567. Here, Dodd admits Singer had the right to conduct the 1984 RIF and does not object to the method used to carry out the RIF. Instead, Dodd has only objected to being terminated as part of that RIF. (T.T. at 143.) Such objection is insufficient to raise an inference of age discrimination. In this case, as in *Elliott v. Group Medical*, the reasons articulated by Singer are rational; and plaintiff does not seriously dispute their objective truth. Plaintiff's burden of establishing the reasons for discharge to be pretextual is therefore "a heavy one indeed." *Id.* at 567. Here, Dodd has failed to show direct, statistical or other circumstantial evidence of intentional discrimination, and has failed to carry that burden.

In sum, Dodd has failed to produce evidence from which a reasonable jury could find discriminatory conduct. Where, as in the case at bar, the plaintiff in a reduction-in-force situation fails to establish that age was at all involved in the employer's decision to terminate him, a directed verdict for defendant is appropriate. *Stendebach v. CPC Intern., Inc.*, 691 F.2d 735, 737-38 (5th Cir.1982), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983).

Therefore, defendant Singer's Motion for a Directed Verdict is GRANTED and the complaint is hereby DISMISSED.

IT IS SO ORDERED.