**MAFA TUIKA, Plaintiff,**

**v.**

**AMERICAN SAMOA DEVELOPMENT CORPORATION, dba RAINMAKER HOTEL, RIMONI TAGA`I, ELISA TUISAMATATELE, and DOES 1-10, inclusive, Defendants.**

High Court of American Samoa
Trial Division

CA No. 42-97

August 10, 1999

155

Before Richmond, Associate Justice, LOGOAI, Associate Judge, and ATIULAGI, Associate Judge.

Counsel: For Plaintiff, Virginia Sudbury
        For Defendants, Fiti A. Sunia, Assistant Attorney General

OPINION AND ORDER

On April 9, 1997, plaintiff Mafa Tuika ("Tuika") filed a complaint for wrongful termination against defendants American Samoa Development Corporation, dba Rainmaker Hotel ("the Rainmaker"), Rimoni Taga`i ("Taga`i"), and Elisa Tuisamatatele ("Tuisamatatele").

Tuika was employed by the Rainmaker from 1989 to May of 1996. No employment contract was ever signed between Tuika and the Rainmaker. At the time of employment, Tuika received a copy of the Rainmaker's Operations and procedures Manual ("the Manual") that, among other matters, delineated the Rainmaker's polices regarding promotions, transfers, vacations, conduct, hiring, severance, and termination procedures. A subsequent handbook, the Rainmaker's Employee Handbook ("the Handbook"), was then published and distributed. No procedures regarding termination, however, were included in the Handbook.

On May 9, 1996, Tuika was presented with a written notice of suspension by the Rainmaker. At the time of her suspension, Tuika was the Rainmaker's purchasing officer. The suspension was to allow time for an investigation into accusations concerning the contents of three particular containers and irregularities occurring in the Purchasing Office. Tuika was formally terminated on approximately May 21, 1996. The reasons given by Taga`i, the Rainmaker's controller, included spreading false stories and rumors, dishonesty and stealing, and various failures to perform duties in a satisfactory manner.

■ The determination of whether Tuika was wrongfully terminated depends initially on whether Tuika's employment with the Rainmaker is a just cause or an at-will relationship. Both parties agree that a formal written contract was not negotiated and signed by Tuika and the Rainmaker. Rather, the determination of Tuika's employment relationship depends on whether the Manual or the Handbook justified an employee's expectation of a just cause firing and subsequent termination procedures.

■ Tuika has the burden of proving the existence of a contract and all the facts essential to the cause of action. *Stiles v. Skylark Meats, Inc.,* 438 N.W.2d 494, 496 (Neb. 1989). In order to establish a breach of employment contract claim based upon violation of personnel rules, an employee must prove that a personnel manual actually became part of an employment contract and that the terms of the manual were breached. *Wagner v. City of Globe,* 722 P.2d 250, 254 (Ariz. 1986); *see also*

For these purposes, we find that the Handbook is controlling for determining whether the guidelines justified an expectation of just cause employment. However, even if the Manual created contractual rights, the Handbook superceded the Manual and modified the terms of employment created by the Manual. *See Burton v. Atomic Workers Federal Credit Union,* 803 P.2d 518, 520 n.1 (Idaho 1990) (employment manual may modify terms of employment); *Sadler v. Basin Elec. Power Co-op.,* 431 N.W.2d 296, 300 (N.D. 1988) (an original employment contract may be modified or replaced by subsequent unilateral contract in employee handbook)

■■■ Upon reviewing relevant case law and the Handbook, we find that the Handbook does not give rise to contractual rights and obligations by employees. Evidence relevant to this decision includes the language of the personnel manual, any representations made by the employer, and the course of dealing between the employee and employee. *Wagner,* 722 P.2d at 254 (citation omitted). In *Palelei v. Star Kist Samoa,* 5 A.S.R.2d 162, 166 (Trial Div. 1987), this court found that the handbook then at issue gave way to contractual rights. Among the provisions the court found persuasive were a description of a progressive discipline scheme, a list of transgressions that resulted in immediate dismissal, and the requirement that the employee sign the handbook, indicating that he or she understood the terms set forth. *Id.* at 166. The progressive discipline scheme was detailed, allowing for counseling by the employee's supervisor and written notice. The Star Kist handbook also specified which provisions of the discipline scheme would be utilized for each offense, up to the fourth offense. The level of detail included in the Star Kist handbook is sufficient to justify an employee's expectation of this disciplinary procedure. A combination of all these items resulted in contractual rights. The Rainmaker Handbook simply does not contain this kind of mutual commitments.

■■■ Even if the original Manual was not subsequently amended by the Handbook, we find that the Manual also does not give rise to contractual rights. The only element similar to the Star Kist handbook is that the Manual lists violations which subject employees to "disciplinary action up to and including immediate discharge for cause." Manual at 2. This statement, by itself, does not lead to contractual rights. In addition, the Manual does not specify any progressive discipline procedures or require a signature evidencing understanding of the guidelines. Unlike the Handbook, however, the Manual does provide for certain termination procedures, but they are internal, managerial procedures. For example, the termination procedures simply specify .procedures that the *employee's* supervisors must follow for terminating personnel. These procedures do not require the employers to provide the employees with

notice of termination or allow for a hearing of any kind.

■ The Handbook is even more vague. All that the Handbook contains are random sentences specifying causes which result in immediate termination. In addition, the Handbook does not provide for any discipline scheme or signatures by the employee. Nor are there any other relevant guidelines which may lead us to conclude that a just-cause employment relationship had been formed. Tuika was an at-will employee. Her employment could be terminated for any reason or even no reason, regardless of the merits of the grounds assigned as the basis of this result. *Dodd v. Singer Co.,* 669 F. Supp. 1079, 1085 (N.D. Ga. 1987); *Gilbert v. Tulane Univ.,* 909 F.2d 125, 126 (5th Cir. 1990); *Breen v. Dakota Gear & Joint Co., Inc.* 433 N.W.2d 221, 223 (S.D. 1988).

■ Tuika still contends that, in any event, she was not afforded any opportunity to pursue the Rainmaker's customarily established post-termination grievance procedure. According to three witnesses, a grievance procedure was commonly available at the Rainmaker in termination situations. Without express terms conveyed to an employee, however, an employer is not legally bound to treat each and every employee in the same fashion based upon past policies and practices. *First Atlantic Leasing Corp. v. Tracey,* 738 F. Supp. 863, 878 (D.N.J. 1990). Moreover, causes for termination listed in the handbook resulting in immediate dismissal do not require post-termination grievance procedures. *See Palelei,* 5 A.S.R.2d at 166 (employer's failure to use progressive discipline sanctions provided in policy manual before terminating plaintiff was not wrongful when plaintiff had apparently committed acts explicitly listed in the manual as justifying immediate dismissal). As set forth in the Handbook, immediate dismissal is warranted for gossiping, spreading rumors, and for stealing. No post-termination grievance procedure, therefore, was required for terminating her employment with the Rainmaker.

■ We do find, however, that the Rainmaker did not act in good faith in informing Tuika of her termination. On May 26, 1996, Taga`i recommended that the Rainmaker's Board of Directors approve Tuika's suspension and dismiss her from her position as purchasing officer. Tuika was not formally notified of her termination. She apparently first learned that she was terminated on August 7, 1998, during the course of discovery proceedings after this lawsuit was commenced. This was more than two years after her suspension on May 9, 1996. Although an employer is not obligated to immediately terminate an employee once a decision to terminate has been made, the employer must act in good faith and notify the employee of this decision in reasonable manner. *Connolly v. Montana Board of Labor Appeals,* 734 P.2d 1211 1215 (Mont. 1987). The Rainmaker failed to act in good faith by neglecting to provide Tuika with notice of termination in a timely manner.

■ Although the notice of suspension to Tuika informed her that she was suspended indefinitely, we find it incredulous that she would not affirmatively inquire as to her employment status during the lengthy period of time that transpired after her suspension. Tuika attempts to excuse her lack of mitigation on the failure to be informed of her termination status at the Rainmaker. Tuika, however, could and should have inquired into her status after a reasonable period, which we find to be no more than three months after her suspension.

Tuika is not entitled to reinstatement of her employment with the Rainmaker. She is entitled to receive unpaid regular, overtime, and vacation pay. However, there is no basis for her claim to sick pay or severance pay. The amounts that she claimed for her annual salary rate, unpaid overtime compensation, and unpaid vacation pay are uncontroverted under the evidence. Therefore, we conclude that Tuika is entitled to recover $3,525 in back salary (equal to three months), plus $3,000 in overtime compensation and $813.46 in vacation pay (equal to three weeks' regular pay), subject to required statutory withholdings and any deductions which Tuika had authorized in writing at the time of her termination. She is also entitled to her costs of suit incurred in this action.

■ Although Taga`i and Tuisamatatele were named defendants, they are not Personally liable to Tuika. Taga`i and Tuisamatatele are both agents of the Rainmaker.[1] An agent is not liable for lawful acts done within the scope of his authority for and on behalf of a disclosed principal." 3 AM.JUR.2D *Agency* § 302. The act of investigating and terminating Tuika are presumed to be acts done within the scope of authority granted by the Rainmaker to Taga`i and Tuisamatele No allegations by the Rainmaker have been made and no evidence has been presented to the contrary. A principal is solely liable for acts of its agent committed in the course of or within the scope of the agent's employment. *Pollas v. Hardware Wholesalers, Inc.*, 663 N.E.2d 1188, 1190 (Ind. App. 1996) (citation omitted); *Southwest Land Title Co. v. Gemini Financial Co.*, 752 S.W.2d 5 (Tex. App. Dallas 1988) (citation omitted). Therefore, among the named defendants, the American Samoa Development Corporation, dba Rainmaker Hotel, alone is liable to Tuika and responsible for payment of the judgment.

Judgment shall enter accordingly.

It is so ordered.

---

[1] A Principal agent relationship exists when the Principal intends that an agent act for him, the agent intends to accept the authority and acts on it, and this intention is expressed either in words or conduct between them. 3 AM.JUR.2D *Agency* § 17 (1986).