**Clifford S. MARTIN, Plaintiff,**

v.

**TELEDYNE BROWN ENGINEERING, Defendant.**

**Civil A. No. 95–0464–RV–M.**

United States District Court,
S.D. Alabama,
Northern Division.

May 1, 1996.

---

Clifford S. Martin, Camden, AL, pro se.

Chris Mitchell & Thomas A. Davis, Birmingham, AL, for defendant.

### ORDER

VOLLMER, District Judge.

This matter is before the court on defendant's unopposed "motion for summary judg-ment" (tab 27). The court has reviewed the motion, as well as all of the supporting evidentiary materials. Having done so, the court concludes, for the reasons that follow, that the motion is due to be, and hereby is, **GRANTED.**

### Background

1. Plaintiff Clifford Martin ("Martin"), who is proceeding in this case *pro se,* is a black male and a former employee of the defendant Teledyne Brown Engineering's Fabricated Products Division in Jackson, Alabama ("Teledyne").

2. Martin began working for Teledyne on March 22, 1994, as a shift supervisor.[1] At the time, Teledyne was beginning to produce tents; in fact, these were the major products produced by the company. The intricacies of production had not been entirely determined, and Teledyne had not fully ascertained its equipment, material, and personnel needs. For this reason, production was inefficient, and Teledyne was losing money on each tent produced. Ezell Aff. ¶ 2.

3. Teledyne's primary customer at the time was the Defense Personnel Support Agency ("DPSA"). As a result of the Gulf War and other national (*e.g.,* the Florida hurricane and Midwest flooding) and international (*e.g.,* Haitian and Bosnian) crises, the DPSA's immediate need for tents had substantially increased, and contract deadlines were short. Teledyne expanded its work force beyond the levels planned for start-up, creating further inefficiencies and profit losses. The immediate need for tents and resulting increase in overall employment numbers created managerial staffing shortages. To address those, Teledyne deviated from its customary practice of training and promoting from within. Martin was hired at this time directly into a supervisor's position, rather than working his way up from an hourly position like the other supervisors in the facility. *Id.* ¶ 3.

4. After Martin was hired, Teledyne studied the production process and determined what needed to be done to make production more profitable. It discovered that the drain

---

1. In August 1994, the job titles of all shift supervisors were changed to area supervisors. There was no change in pay or benefits or change in job responsibilities. Ezell Aff. ¶ 2.

on profits was created primarily by redundancies and inefficiencies in several staffing areas. To eliminate those redundancies, duties were reassigned or consolidated. As a result, numerous positions were discontinued, and the affected employees either were transferred to other areas or laid off. *Id.* ¶ 4.

5. The consolidations and reductions did not just impact hourly employees. Teledyne's review of its managerial needs also revealed that the functions of at least two supervisory positions needed to be consolidated and the supervisors laid off or transferred. *Id.*

6. Teledyne has a written policy governing managerial staff reductions. The policy was in effect prior to and at the time of Martin's employment. According to the policy, when a reduction-in-force ("RIF") is required, Teledyne assesses the qualifications of all the salaried employees within the functional department. [At the time the review relative to this case was made, Martin was an area supervisor within the General Purpose Large Tents ("GPLT") department.] If the qualifications of all supervisors within the department are relatively equal, seniority with Teledyne governs. *See* Martin Depo., Exh. 10; Ezell Aff. ¶ 5.

7. Earl Wallace ("Wallace"), Teledyne's Vice President/General Manager, and Roy Ezell ("Ezell"), Teledyne's Director of Operations, reviewed and applied this policy when selecting the two supervisors who would be laid off. At that time, there were eight (8) area supervisors, including Martin, within the GPLT department. They were (with race and seniority date indicated):

| Name | Race | Seniority Date |
| --- | --- | --- |
| Erma Ruth Harris | W | 8/04/86 |
| Clara Woods | B | 5/17/93 |
| Joyce Hawkins | B | 5/25/93 |
| Pat Sullivan | W | 8/10/93 |
| Corretta Thames | B | 8/23/93 |
| Vernell Taylor | B | 8/23/93 |
| Harold Donaldson | B | 12/31/93 |
| Clifford Martin | B | 3/22/94 |

Ezell Aff. ¶ 6 & Exh. 2.

8. Wallace and Ezell determined that the qualifications of these supervisors were all

comparable. Pursuant to the written policy, seniority then governed. Martin and Harold Donaldson, also a black male, were selected. Of these two, Martin had the least seniority.[2]

9. Because Martin had begun employment as a supervisor and had never worked in any other position, he had no "bumping rights." Transfer to an hourly position, thus, was not an alternative. Accordingly, on December 6, 1994, Jerry Reeves, Martin's supervisor at the time, informed Martin that he was being laid off as part of an RIF. Ezell Aff. ¶ 7; Martin Depo. at 127.

10. Since Martin's lay off, the workforce at the Jackson facility has decreased from 558 to 173 employees. Further, the number of area supervisors in the GPLT department has decreased from 8 to 4. No new area supervisors have been hired nor have any existing employees been promoted to area supervisor with the GPLT department. Ezell Aff. ¶ 8.

11. Martin filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Teledyne on January 6, 1995. In it, he claimed only that he had been discriminated against on the basis of his race when he was terminated from his employment in December 1994. Martin Depo., Exh. 1.

12. The EEOC investigated the charge and specifically found that Martin, as the least senior supervisory employee in his area, had been discharged as part of an overall reduction in Teledyne's labor force. The EEOC further found that there was no evidence of a nexus between Martin's discharge and his race. Martin Depo., Exh. 2.

13. On June 9, 1995, Martin filed this lawsuit complaining that Teledyne had discriminated against him on the basis of his sex, race, and religion. He sought permission to amend his complaint on November 22, 1995, to add claims other than racial discrimination in discharge. He specifically sought

---

**2.** Donaldson ultimately was not laid off at this time because production demands changed and necessitated the lay off of only one supervisor.

He was, however, removed from his supervisor's position in June 1995. Ezell Aff. ¶ 7.

to add three allegations to the complaint: (1) that Teledyne refused to take any remedial action when he was called a derogatory name by a co-employee; (2) that he was sexually harassed, and Teledyne failed to protect him even though it had knowledge of the harassment; and (3) that he is entitled to compensation for Teledyne's use of his ideas. *See* Complaint and Motion to Amend Pleadings.

14. By order dated January 3, 1996, the court ruled that the scope of Martin's complaint would be determined by the EEOC charge and investigation. Once again, the only claim raised before the EEOC was Martin's claim that he was discharged because of his race.[3] Martin was allowed to amend his complaint, but only for the purpose of including allegations that are or might be probative of his claim that he was discharged because of his race.

### Discussion

1. The court has jurisdiction over Martin's Title VII claim for racially discriminatory discharge. 42 U.S.C. § 2000e *et seq.;* 28 U.S.C. 1331.

2. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Rice v. Branigar Organization, Inc.,* 922 F.2d 788, 790 (11th Cir.1991). The clear language of Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

3. The party moving for summary judgment

bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of

material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991) (Cox, J.); *see Mercantile Bank & Trust, Ltd. v. Fidelity & Deposit Co.,* 750 F.2d 838 (11th Cir.1985). At all times, however, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all reasonable doubts in its, her, or his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 609 (11th Cir. 1987). The district court cannot resolve factual disputes by weighing conflicting evidence. *Tippens v. Celotex Corp.,* 805 F.2d 949 (11th Cir.1986), *reh'g den.,* 815 F.2d 66 (1987). If reasonable minds might differ on the inferences arising from undisputed facts, then the court must deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust,* 750 F.2d at 841).

4. With respect to issues on which the non-moving party would bear the burden of proof at trial, the moving party may satisfy its initial burden in one of two ways. First, bearing in mind that "the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge [its] initial responsibility," it "simply may show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the non-moving party's case." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–17 (11th Cir.1993). "Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Id.* at 1116. If the moving party fails to discharge its initial burden,

3. The court's order precludes Martin from pursuing his claims of sexual and religious discrimina-

tion. Those claims are not a part of this case and will not be discussed further.

then the motion must be denied and the court need not consider what, if any, showing the non-movant has made.... If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

*Id.* (citation and footnote omitted).

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence.... Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency....

*Id.* (citations omitted). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990); *Earley v. Champion International Corp.,* 907 F.2d 1077 (11th Cir.1990).

5. Teledyne asserts that summary judgment is appropriate on Martin's claim of discriminatory discharge. Its principal position is that Martin cannot establish a prima facie case of discrimination. Alternatively, it asserts that it has articulated a legitimate, nondiscriminatory reason for Martin's discharge as to which no evidence of pretext has been or could be submitted by Martin.

6. In a Title VII case for illegal discrimination based on race, the plaintiff must prove by a preponderance of the evidence that the defendant acted with discriminatory intent. *Clark v. Huntsville City Bd. of Educ.,* 717 F.2d 525, 529 (11th Cir.1983). A plaintiff can prove discriminatory intent by either direct or circumstantial evidence. Direct evidence is not an issue in this case. Martin Depo. at 83.

7. Recognizing that direct evidence of discriminatory intent seldom is available, the Supreme Court fashioned a three-step procedure for analyzing claims that are based on circumstantial evidence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* procedure allows a court to analyze such claims by creating permissible inferences of discriminatory intent. Under it, the plaintiff retains the ultimate burden of persuading the trier of fact that the defendant is guilty of intentional discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207, 215 (1981); *see St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

8. Under *McDonnell Douglas,* a plaintiff is first required to create an inference of discriminatory intent by establishing a prima facie case of discrimination. He may do so by proving, by a preponderance of the evidence, that he is a member of a protected class (*i.e.,* possesses a protected characteristic) and that he was treated differently on the occasion at issue than another similarly-situated employee who was not also a member of that class. In effect, establishment of the prima facie case creates a presumption that the employer unlawfully discriminated against the employee. If the plaintiff cannot satisfy his prima facie burden, the defendant need not present any reason for its action and the court must determine if the plaintiff has met his ultimate burden of proving intentional discrimination. *Hawkins v. Ceco Corp.,* 883 F.2d 977, 981 (11th Cir.1989)

9. If, however, the trier of fact believes the plaintiff's evidence, the burden

then shifts to the defendant to counter the inference of discrimination by producing some evidence of, or articulating (not proving), some legitimate, non-discriminatory reason for the action taken against the employee. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1096, 67 L.Ed.2d at 218 ("[T]o satisfy this intermediate burden, the employer need only produce admissible evidence that would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."). The employer's task is to rebut the plaintiff's presumption, not to persuade the court that it was actually motivated by the proffered reason. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216 (citing *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 295–96, 58 L.Ed.2d 216 (1978)). If the trier of fact believes the plaintiff's prima facie evidence and "the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216. "[T]he defendant's explanation of its legitimate reasons must be clear and reasonably specific." *Id.* at 258, 101 S.Ct. at 1096, 67 L.Ed.2d at 218. "In short, the district court must decide which party's explanation of the employer's motivation it believes." *United States Postal Serv. Bd. v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403, 411 (1983).

10. If the defendant responds by offering an adequate rationale for its action, the burden then shifts to the plaintiff to prove, by a preponderance of the evidence, that the defendant's proffered reason is merely a pretext for intentional discrimination. The burden to establish pretext merges with the plaintiff's ultimate burden of proof of intentional discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. If all

valid reasons are rejected as pretextual, then it is likely that discrimination was the true reason. *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1481–82, 75 L.Ed.2d at 411. The plaintiff can satisfy his burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217.

11. A Title VII plaintiff can establish a prima facie case under *McDonnell Douglas* in a number of ways. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.), *reh'g denied,* 747 F.2d 710 (1984). In the context of a discriminatory discharge claim, a plaintiff can make out a prima facie case by proving that he was qualified for the job, but was fired and replaced by one outside his protected class. *Krieg v. Paul Revere Life Ins. Co.,* 718 F.2d 998, 999 (11th Cir.1983). Or, he can do so by proving that he was discharged while others not in his protected class " 'having comparable or lesser qualifications,' were retained." *Nix,* 738 F.2d at 1185 (quoting *Whiting v. Jackson State Univ.,* 616 F.2d 116, 121 (5th Cir.1980)).

12. As part of his initial burden, moreover, the plaintiff must prove that he and the controlled employee were similarly-situated in all respects.[4]

13. In this case, in order to establish a prima facie case of discriminatory discharge, Martin would have to show that he, as a black man who was satisfactorily performing his job, was discharged, while a white employee who had comparable or lesser seniority was retained. Teledyne has shown, through the adduction of Martin's deposition, that Martin does not have any evidence that a similarly situated white employee with less seniority than he was re-

---

4. Whether individuals employed in other, largely autonomous departments of the same defendant corporation are "similarly-situated" generally depends on the facts of each case. The fact that two individuals do not have the same supervisor does not necessarily render employees incomparable, although it may substantially impair the plaintiff's ability to prove discriminatory animus.

See, e.g., *Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir.1989). Considering that Teledyne made the RIF determination at issue on a department-by-department basis, the court believes it proper to consider only whether Martin was treated differently than a similarly-situated white supervisory employee within the GPLT department.

tained. Martin Depo. at 70–71, 84. Teledyne's own records reflect that two white GPLT area supervisors, Erma Ruth Harris and Pat Sullivan, were retained at the time Martin was laid off. Both of those employees had seniority over Martin: Harris has been employed by Teledyne since 1986 and, Sullivan, since May 1993. Since there is no evidence of a similarly situated white employee being treated differently, Martin cannot establish a prima facie case of discrimination.

14. Even assuming that Martin could establish a prima facie case of race discrimination, *McDonnell Douglas* requires only that Teledyne come forward and "articulate some legitimate, nondiscriminatory reason" for its action successfully to rebut the inference of discrimination raised by plaintiff's prima facie case. Teledyne has met that burden of articulation: Martin was laid-off pursuant to Teledyne's RIF plan. Martin Depo. at 127; Ezell Aff. ¶ 7.

15. Once an employer articulates a legitimate, nondiscriminatory reason for its actions, a plaintiff must present additional evidence to prove that the reason for the discharge articulated by the employer is a mere pretext for unlawful intentional discrimination. Teledyne asserts that Martin cannot show that the stated reason for his discharge offered by it was in any way pretextual.

16. Martin did not file a response to Teledyne's motion for summary judgment, but Teledyne did offer Martin's entire deposition in support of the motion. The court, thus, has before it Martin's version of why he was laid-off. Having reviewed that deposition, it is apparent that Martin will be unable to establish pretext and intentional discrimination at trial.

17. Martin's belief that he was discriminated against on the basis of race simply is not supported by the evidence. Martin testified at length about his disciplinary record and suggested that the record was altered to make it more severe than it, in fact, was. That testimony, however, does not derogate (*i.e.,* reveal as pretext) Teledyne's proffered reason for discharging Martin (*i.e.,* RIF). Under the state of the evidence, it also does not give rise to a genuine issue that Teledyne had a mixed motive in discharging Martin or that Martin was discharged on the basis of his race.

18. Martin also testified at length about an incident that occurred just prior to his discharge. According to Martin, he was called a "motherfucker" by a black co-employee. That employee was reprimanded and apologized to Martin. Martin was discharged shortly thereafter. Martin Depo. at 93–98. Martin maintains that Teledyne has a policy against using profanity in the workplace (a contention that Teledyne refutes, Ezell Aff. ¶ 9), which should have necessitated the offending employee's discipline. Using logic that this court does not fully understand, Martin connects his termination to the swearing incident and argues that he must have been terminated because of his race. In the court's opinion, this incident is in no way probative of a racially discriminatory discharge.

19. When asked why he filed the complaint in this case, Martin stated: "I filed the complaint because the explanation that the defendant had been given according to the reference that I got from the Court. All the defendant had to do was offer any type of frivolous defense. And in *my opinion* that was what the defendant had done ..." Martin Depo. at 70–71. This evidence is insufficient to create a triable issue of fact over Teledyne's proffered reason for Martin's discharge. Ultimately, Martin's belief that he was discriminated against on the basis of his race is supported only by his own "opinion." Mere conjecture and opinion are not sufficient to prove a violation of the discrimination laws. *See Marietta v. Cities Service Oil Co.,* 414 F.Supp. 1029, 1034 (D.N.J.1976); *McClain v. Mack Trucks, Inc.,* 532 F.Supp. 486, 489 (E.D.Pa.1982). Accordingly, defendant is entitled to summary judgment.

### Miscellaneous

20. As previously noted, Martin amended his complaint on November 22, 1995, to assert additional allegations. The court issued an opinion allowing his amendment, but only to the extent that the new allegations are probative of his discharge claim. Martin's

additional allegations with respect to discharge are that (1) Teledyne refused to take any remedial action when he was called a derogatory name by a co-employee; and (2) Teledyne used his idea, he thus became more valuable to Teledyne so as to exempt him from the RIF by seniority plan, and Teledyne thereafter terminated him because of his race. Teledyne has shown that Martin cannot produce any evidence showing a connection between these allegations and his discharge. The allegations are not probative of the plaintiff's claim that he was discharged because of his race.

21. The swearing incident is discussed above. Once the co-employee apologized to Martin, Teledyne considered this issue closed, and no disciplinary action was taken against her. Ezell Aff. ¶ 9. This incident certainly was not racially motivated because both parties to the incident (Martin and the co-employee) were black. Further, this issue is irrelevant to Martin's discharge claim, and there is no evidence connecting it to the discharge.

22. Martin also suggests (by his amended pleading and statements made in deposition) that Teledyne used his idea, thereby making him more valuable to Teledyne so as to exempt him from the RIF by seniority plan, and thereafter terminated him because of his race. Martin Depo. at 105. Martin testified that before he was discharged, he suggested to his supervisor at the time, Don Loper, that Loper move another employee, Jamie Lambert, into the shipping and receiving area. Martin Depo. at 102–06. Lambert was moved into that area in August 1994. Ezell Aff. ¶ 11. Martin submits that he should have been compensated for this idea because this move saved Teledyne money.

23. Teledyne has a program under which employees who suggest ideas that save the company money receive compensation. This program is called the Continuous Process Improvement program ("CPI"). Employees are required to complete a form describing their idea, and then submit it to Jerry Reeves, the CPI coordinator in Jackson, Alabama, who submits it to Teledyne's office in Huntsville, where the idea is considered. If an idea is selected, the employee is compen-

sated. If an idea is rejected, the form is returned to the employee. Ezell Aff. ¶ 11.

24. Martin did not complete a CPI form related to the Lambert move, and Teledyne has no record of him submitting any CPI forms related to any other idea. Martin Depo. at 103 & 106; Ezell Aff. ¶ 11. Nevertheless, suggesting that an employee be transferred to another job is not the type of "idea" for which Teledyne compensates employees. Moreover, Teledyne saved no money as a result of Lambert's transfer. This suggestion by Martin was not deemed by Teledyne to be evidence of Martin's superior qualification so as to create an exception to the seniority policy. There is no evidence suggesting that defendant discharged Martin because of this idea, or showing that he should have been exempted from the RIF seniority policy because of it.

### Conclusion

In light of the foregoing, the court concludes that defendant's motion for summary judgment is due to be, and hereby is, **GRANTED** in its entirety. Martin is not entitled to anything on his racially discriminatory discharge claim, the only one is properly considered in this case. *See supra* note 3 & accompanying text.