**Stanley F. BROWN, Plaintiff,**

v.

**STONE CONTAINER CORPORATION, Defendant.**

**No. CV 496–225.**

United States District Court, S.D. Georgia, Savannah Division.

June 3, 1997.

---

Randall A. Schmidt, Savannah, GA, for Plaintiff.

Ryburn C. Ratterree, Savannah, GA, Carol B. Manzoni, Chicago, IL for Defendant.

### ORDER AND MEMORANDUM

NANGLE, District Judge.

On May 14, 1997, this Court granted defendant Stone Container Corporation's motion for summary judgment. This order and memorandum contains the Court's reasoning behind that decision and shall be substituted for the Court's previous order.

### BACKGROUND [1]

Plaintiff, who is black, was hired by defendant Stone Container Corporation (hereinafter "Stone" or "defendant") in a temporary position on January 25, 1972. That position became permanent on July 6, 1972.[2] From its inception, plaintiff's employment with

---

1. The "Background" section of this order is taken from the Proposed Consolidated Pretrial Order Stipulations and the undisputed facts in defendant's Local Rule 56.1 statement.

2. Plaintiff notes that he was actually hired by Continental Can Company, which appears to be the predecessor corporation of Stone Container.

Stone was covered by the terms of the collective bargaining agreement between Stone and United Paperworkers International Union Local 638 (hereinafter "Local 638"). Specifically, at all times relevant to this action, plaintiff's employment was governed by the collective bargaining agreement in force from June 8, 1992 to June 19, 1998 (hereinafter "CBA").

### A. The Collective Bargaining Agreement.

The CBA provided for the grievance of all performance-related criticisms, including oral warnings, written warnings, letters of reprimand and attendance-related criticisms. To facilitate grievances, a procedure was established for "the prompt, orderly and judicious solutions of the problems which may arise regarding the interpretation or application of the provisions" of the CBA.

Under the terms of the CBA, letters of reprimand must contain the following language: "Nothing contained in this letter of reprimand shall be used to the disadvantage of the employee to which it is directed after one year from date of issue."[3] Thus, those reprimands which have been issued within the past year are referred to as "active." The existence of an "active" reprimand can impact the severity of subsequent disciplinary actions occurring within the one-year period. There is no dispute that plaintiff was aware of that fact.

The CBA also defines a line of progression[4] for each of Stone's operations. One such line of progression exists within the powerhouse to which plaintiff was permanently assigned. The CBA defines the procedure for providing "set-ups" to vacant positions within the line of progression.[5] Bargaining unit members not wishing to be set-up to the next higher position have the

right to execute a waiver relinquishing their right to be promoted to the next position. Absent such a waiver, Stone is required to set-up the next eligible employee within the line of seniority to the vacated position within the line of progression.

Finally, the CBA provides that "[t]he parties signatory to [the CBA] shall not discriminate against any employee because of race, creed, color, sex, national origin or physical handicap."

### B. Stanley F. Brown's Relevant Employment History.

On August 8, 1989, plaintiff was promoted to the position of permanent area operator in the powerhouse line of progression. The highest position within the powerhouse is that of senior operator; permanent area operator is that position directly below senior operator. As a permanent area operator, Brown received training for being set-up to the senior operator position. That training lasted from April of 1992 through July of 1993. At plaintiff's request, Stone moved plaintiff to another shift where he could receive his training for the senior operator position from a permanent senior operator who plaintiff regarded as highly qualified. In August of 1993, plaintiff accepted a temporary set-up to the senior operator position, including pay at the wage scale set by the CBA for that position. At that time, plaintiff considered himself qualified to perform these responsibilities. Plaintiff understood that while temporarily set-up to the senior operator position he assumed all of the responsibilities of the senior operator position and could be disciplined for failure to perform those responsibilities. Between this first set-up in August of 1993 and his termination in October of 1995, plaintiff was set-up to the senior

---

**3.** In its personnel records, however, Stone maintains copies of disciplinary and personnel actions taken from the beginning of his or her employment. The CBA contains no requirement that Stone dispose of disciplinary actions that are more than one year old; it merely requires that progressive discipline be based solely upon those reprimands which were given within the past year.

**4.** The line of progression defines how bargaining unit members move upward within the operating structure on a temporary or permanent basis. Upward movement is based entirely upon seniority.

**5.** Although plaintiff disputes defendant's characterization of a set-up as a temporary promotion, that appears to be precisely what a set-up is. When an individual is "set-up" to the next position, that individual receives the same benefits and is responsible for the same duties as if the individual had been promoted to that position.

operator position for a total of 15 work weeks. During this time period plaintiff considered himself qualified to perform the responsibilities of the senior operator position. At no time did plaintiff execute a waiver of his right to be promoted from the area operator position to the senior operator position.

In the year prior to his termination, which occurred on October 30, 1995, plaintiff had been reprimanded three times.[6] These reprimands were for: (1) violating Stone's policy concerning facial hair on February 16, 1995; (2) violating Stone's policies concerning clock rings and carrying and maintaining his badge on June 30, 1995; and (3) poor job performance while assuming the responsibilities of the senior operator position on June 26, 1995.[7] Despite his knowledge that the existence of active reprimands in his file could impact the severity of any subsequent disciplinary action, however, plaintiff failed to file a grievance concerning *any* of the written reprimands he received during the year prior to his termination.

As a result of his ongoing performance problems (and specifically for the June 30, 1995 incident)[8] plaintiff was suspended without pay for three days beginning June 30, 1995.[9] Plaintiff was advised by powerhouse superintendent William Adams that any further mistakes would result in his termination. Plaintiff did not execute a waiver of the senior operator position; he continued to consider himself qualified for that position.

On October 24, 1995, while once again temporarily set-up to the senior operator position, plaintiff failed to incinerate stripper gases within the time allotted under Stone's operating guidelines. Plaintiff admittedly "forgot about the stripper gases venting."

This resulted in plaintiff's suspension pending investigation. On October 30, 1995, plaintiff, together with his union representative, met with Stone's management representatives, was advised of his termination and received written notice of that termination. The notice of termination summarized plaintiff's performance and disciplinary record during the previous twelve months, as well as the events of October 24, 1995. It concluded with the following statement: "Efforts through training, counseling, as well as progressive discipline, have not been successful in your improvement to an acceptable level of performance. Therefore, the company is terminating your employment effective October 30, 1995, for your continued inability to perform your job in an acceptable manner."

Local 638 automatically filed a grievance concerning plaintiff's termination, in accordance with its practice concerning terminations. Plaintiff then met with his union representatives. Following that meeting, plaintiff and his union representatives met with a representative of Stone Container. On November 9, 1995, Stone Container provided plaintiff and his union representatives setting forth the terms of a "last chance" agreement. That agreement was an offer of reinstatement with several requirements. It required that plaintiff sign a waiver of his permanent position (area operator), that plaintiff accept a set-back to the next position in the line of progression (auxiliary I operator) and that plaintiff satisfactorily perform the functions of the auxiliary I operator during a one-year probationary period. Any termination for poor performance during that one-year period would be without recourse.

---

6. Plaintiff does not dispute the existence of these reprimands. Plaintiff, however, now argues, for what appears to be the first time, that each of the reprimands was placed in the file as a result of "racial discrimination in employment," rather than the reasons stated on the reprimands.

7. This third reprimand was given specifically because plaintiff allowed the dissolving tank density to become and remain out of control, resulting in the risk of an explosion.

8. Plaintiff disputes that his June 30, 1995, reprimand was based upon his poor performance while set-up to the senior operator position. He

further disputes that there was a risk of explosion.

9. In plaintiff's "Statement of Controverted Facts," plaintiff claims that this fact is in controversy. In plaintiff's deposition, however, he clearly states that he was suspended and the notice of suspension contained the reasons given. It appears that plaintiff may once again be arguing that the suspension was not given for the reasons listed or that his performance did not merit a suspension. In any event, it is clear the plaintiff was indeed suspended and the reason given was his ongoing performance problems.

Plaintiff's union representatives accepted the terms of the agreement and executed the letter of reinstatement.

On November 17, 1995, plaintiff provided a written response to Stone's offer of reinstatement, accepting the "waiver" and "set-back" provisions, but rejecting the "without recourse" provision. On November 20, 1995, Stone rejected plaintiff's "counter-offer" and advised plaintiff that he had until November 27, 1995 to accept the stipulations of its offer and return to work. Plaintiff never did so.

Instead, plaintiff waited until some time in January or February of 1996, when he met with his union representatives to discuss the possibility of taking his termination grievance to arbitration. The time for doing so, however, had long since passed. At this point, plaintiff considered filing an unfair labor practice charge against the Union for its handling of the arbitration issue, but did not do so.

On September 18, 1996, plaintiff filed this suit in the Southern District of Georgia alleging a violation of Title VII, 42 U.S.C. § 2000e *et seq.*, specifically claiming that he was terminated based upon his race. On April 9, 1997, defendant timely filed a motion for summary judgment which is now before the Court.

### DISCUSSION

#### A. Standard for Summary Judgment,

Summary judgment serves to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial". Fed.R.Civ.P. 56 advisory committee's note, *cited in Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). It is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A court must view the evidence and any inferences that may be drawn from it in the light most favorable to the nonmovant. *Mercantile Bank & Trust Co., Ltd. v. Fideli-*

*ty & Deposit Co.*, 750 F.2d 838, 841 (11th Cir.1985).

The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Such a showing shifts to the nonmovant the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986); *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir.1991), *cert. denied,* 506 U.S. 903, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992). "Factual disputes that are irrelevant or unnecessary will not be counted", *United States v. Gilbert,* 920 F.2d 878, 883 (11th Cir.1991) (citation omitted), and a mere scintilla of evidence supporting the nonmovant's position will not fulfill this burden. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

#### B. Title VII.

In a Title VII discrimination case, the shifting-burden analysis of *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), governs the establishment of intentional discrimination. Under *McDonnell Douglas,* the plaintiff bears the initial burden of establishing a prima facie case of discrimination. This is accomplished by either direct or circumstantial evidence. Given the likelihood that most employers do not go around making notations in employees' files that the employee was terminated for illegal reasons, direct evidence of discrimination is difficult to prove and, hence, not often alleged. In the instant case, however, plaintiff apparently urges the Court to treat this as a direct evidence case.[10] Plaintiff, not surprisingly, provides no direct evidence of discrimination. Accordingly, the Court will proceed to analyze this case as one involving circumstantial evidence of discrimination.

In *McDonnell Douglas,* the Supreme Court established a general model by which

---

10. Plaintiff never affirmatively requests that the Court treat this as a direct evidence case. In- stead, plaintiff objects to being "saddle[d] ... with proving a prima facie case."

to establish a prima facie case of discriminatory treatment by circumstantial evidence. Under the *McDonnell Douglas* model, plaintiff must show

1) he was a member of a protected group; 2) an adverse employment action took place; 3) he and a similarly situated non-protected person received dissimilar treatment; and 4) sufficient evidence, either direct or circumstantial, exists to infer a nexus or causal connection between race and the disparate treatment.

*Woodbury v. Sears, Roebuck & Co.*, 901 F.Supp. 1560, 1563 (M.D.Fla.1995). *See also McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir. 1984).

■ While *McDonnell Douglas* provides the general framework for establishing a prima facie case, when the claim for discrimination is based on differential application of work or disciplinary rules,[11] a slightly different version of the prima facie case has been used by the courts of this circuit.[12] That slightly modified version of the prima facie case requires the plaintiff to show "that he is a member of a protected class, that he was qualified for the job from which he was fired, and 'that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'" *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir.1984) (citing *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982)). Each of these elements will be discussed below.

### 1 & 2. Member of a protected group / "otherwise qualified".

Plaintiff is black and, therefore, plaintiff satisfies the first element, member of a protected class. Additionally, the Court will assume, for the purposes of this Order, that the plaintiff was otherwise qualified for the job from which he was fired.

### 3. Disparate treatment.

■ It is the third element of the prima facie case where plaintiff encounters problems. Plaintiff must show "that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained." *See Nix, supra,* at 1185. The "misconduct" need not be identical; "...'comparable seriousness'... is [sufficient to make out] an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext." *McDonald, supra,* at 283 n. 11, 96 S.Ct. at 2580 n. 11.

Plaintiff is admittedly "unable to identify any senior operator, either in a temporary or permanent position, who is white or black, who had allowed stripper gases to vent as

---

**11.** In *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Supreme Court held that an employer would violate Title VII if it fired black employees who participated in a theft of cargo while retaining whites guilty of the same offense. *Id.* at 282–84, 96 S.Ct. at 2579–81 (cited in *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984)).

**12.** Indeed, there are several versions of the prima facie case that have been used by the courts of this circuit, including the one relied upon by defendant. Defendant properly asserts that a member of a protected class makes out a prima facie case if he establishes that he was qualified for the job, but was fired and replaced by one outside the protected class. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995); *Nix* 738 F.2d at 1185; *Krieg v. Paul Revere Life Ins., Co.*, 718 F.2d 998, 999

(11th Cir.1983) (per curiam), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984).

Under this formulation of the prima facie case, plaintiff's claim clearly fails. Plaintiff was admittedly replaced by another minority worker. Given the Supreme Court's admonition that "[t]he prima facie case method ... was 'never intended to be rigid, mechanistic, or ritualistic,'" *U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)) and this circuit's recognition that "a prima facie case of discriminatory discharge may be established in different ways," *Nix,* 738 F.2d at 1185, however, the Court will utilize a different formulation of the prima facie case. This formulation is one of the three recognized by the Eleventh Circuit in the *Nix* case and is discussed in detail below.

plaintiff had, who had *three prior and active reprimands* in their file at the time, and who was not terminated." Defendant's Local Rule 56.1 Statement, ¶ 39 (emphasis in original); *see* Plaintiff's Statement of Controverted Facts (all facts deemed admitted unless controverted). While this appears to be fatal to plaintiff's claim, in the interests of completeness, the Court will nevertheless respond to plaintiff's arguments on this issue.

The sole "similarly situated" individual plaintiff compares himself to is Eugene English, a white permanent senior operator. On December 20, 1995, English failed to incinerate venting stripper gases. Based upon his performance and disciplinary record, English was offered the choice between a "last chance" offer or termination. At the time English was offered the last chance agreement, he had only one prior and active reprimand in his file, dated August 8, 1995, which was for venting stripper gases for which he received a one-week suspension. English accepted the last chance proposal, including an agreement to execute a waiver of his permanent position (senior operator) with a set-back to the next position in the line of progression (area operator) and a one-year probationary period during which English could be terminated for poor performance without recourse.

Yet, in the face of this overwhelming evidence against him, plaintiff attempts to proffer reasons why English was indeed treated differently. The crux of the argument is that, at the time English vented stripper gases, he had an inferior performance record to plaintiff at the time plaintiff vented stripper gases, yet English was not terminated. This argument is flawed for at least two reasons: First, plaintiff establishes English's performance record by reference to two incidents which occurred greater than twelve months before English's inappropriate venting of stripper gases. By the very terms of the reprimands, these events were not permitted to be used against English in determining the appropriate disciplinary action for improperly allowing stripper gases to vent. Second, while it is true that English was not terminated and plaintiff was, the only reason why their treatment was different was be-

cause English accepted a "last-chance" agreement and plaintiff did not. Thus, although English had two *fewer* reprimands in his file, both English and plaintiff were treated in precisely the same way, *i.e.*, each was given the choice between termination and a "last-chance" agreement. Clearly, plaintiff has not shown disparate treatment and therefore has not established a prima facie case of discrimination with his comparisons.

■ Plaintiff makes some additional attempts to establish discrimination which do not necessarily fit neatly into the prima facie case analysis. Rather than merely dismiss them out of hand, the Court will now explore any inferences which may rise from these "arguments." First, plaintiff relies heavily on this Court's decision in *Miller v. Continental Can Company,* Findings of Fact and Conclusions of Law, Civ. No. 2803, 1976 WL 614 (S.D.Ga. Aug. 18, 1976) (Lawrence, C.J.). Plaintiff, however, does not make clear what purpose this order is offered for. Presumably, it is offered to show a "history of discrimination coupled with a failure to abide by a court order." There are several reasons why plaintiff's reliance on this order is problematic. First, to the extent that the order is offered to show a "failure to abide by a court order," plaintiff's reliance on this evidence is misplaced because this is not an action seeking to enforce that order. Second, to the extent that the order is offered to show a history of discrimination, plaintiff's reliance is again misplaced. The condition of the workplace twenty years ago is not necessarily relevant to plaintiff's termination. Since the *Miller* order, the powerhouse appears to have undergone a change in ownership. Certainly the decision-makers involved in plaintiff's termination are not remnants from the *Miller* years. Indeed, given the fact that the *Miller* case was brought because no blacks were working in the powerhouse, the "history of discrimination" described by the *Miller* order is irrelevant to an action brought by a black man who had reached the second-highest position in the powerhouse line of progression. Clearly, any such "history of discrimination" has been overcome. In any event, plaintiff has made no attempt to provide a logical connection

between the *Miller* order and his termination.

Plaintiff next argues that "[t]ons of toxic chemical have been released by Stone in excess of the amount allowed by law, yet, no one other than [plaintiff] has been discharged." Ignoring for a moment the fact that English was disciplined for precisely the same reason as plaintiff, plaintiff has provided no evidence of this statement. Rather, plaintiff has provided literally hundreds of pages dealing with the emissions of Stone Container. Nowhere does plaintiff provide any evidence which would indicate who was responsible for these emissions or whether or not anyone was terminated as a result.

■ The final argument advanced by plaintiff is that the facial hair policy [13] is racially discriminatory because a skin condition suffered by approximately fifty percent of black males prevents half of that number from shaving. Plaintiff argues that the application of the policy in and of itself is a violation of Title VII. There are at least two reasons why plaintiff's reliance on this fact as evidence that plaintiff was terminated for discriminatory reasons is improper. First, the claim in this case is for plaintiff's wrongful termination, not for an allegedly discriminatory policy. If plaintiff had a problem with the policy, he should have filed a grievance at the time of the reprimand or perhaps have filed a charge with the EEOC. Plaintiff did neither. Instead, plaintiff now raises this issue for the first time to prove that he was terminated on the basis of race. While plaintiff's complaint that the reprimand was based on the application of a racially discriminatory policy may have some merit (although the Court expresses no opinion on whether or not it does), it is not relevant to plaintiff's termination.

This is particularly true in light of the second reason why plaintiff's reliance on this issue is improper: plaintiff never claims that he cannot shave. Indeed, had that been the case, he would have been reprimanded more frequently. He is perfectly able to keep his beard trimmed to 1/4", a length for which he would not have been reprimanded. What happened in the instant case is not that plaintiff **could** not shave, but that plaintiff **did** not shave. He worked a double shift and claims that he did not have time to shave. Thus, the reprimand was given, not because of any skin condition plaintiff may or may not have had, but because of plaintiff's poor planning on that particular day. Therefore, this final argument of plaintiff does not support plaintiff's claim that he was *terminated* on the basis of race.

Because plaintiff has failed to state a prima facie case of discrimination and plaintiff's additional arguments do not give the Court any reason to deviate from the use of the *McDonnell Douglas* standard, the Court hereby grants defendant's motion for summary judgment. Having disposed of the case on this issue, the Court need not reach the remainder of defendant's arguments.[14]

## *CONCLUSION*

For the aforementioned reasons,

**IT IS HEREBY ORDERED** that this Court's order of May 14, 1997 be and is vacated.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment be and is granted.

**IT IS FURTHER ORDERED** that all remaining motions in this case be and are dismissed as moot.

---

**13.** Stone requires that powerhouse employees remain clean shaven. This is a safety precaution instituted to ensure a close fit between a respirator and the employee's face in the event that such a respirator becomes necessary.

**14.** As alternative grounds for granting its motion for summary judgment, defendant argues that plaintiff's claim is pre-empted by § 301 of the Labor Management Relations Act, that plaintiff's claim is barred because he contractually agreed to submit all employment disputes to binding arbitration and that plaintiff is judicially estopped from asserting his claim due to his failure to list the claim as an asset when he filed for personal bankruptcy.